**Louis C. STUKENBORG, Harold V. Utterback and Associated Aircraft Industries, Inc.***

**v.**

**The UNITED STATES.**

**No. 298-61.**

United States Court of Claims.

Feb. 17, 1967.

* By order of January 30, 1967, after submission of the commissioner's opinion and the argument and submission of the case to the court, upon consent of defendant, the court granted plaintiffs' motion to substitute Associated Aircraft Industries, a partnership comprised of Elmer S. Eddins, James D. Nunnally, David A. Nunnally, Alice N. Smith and Betty G. Nease, as a party plaintiff in place of Associated Aircraft Industries, Inc.

Alfred C. Aurich, Philadelphia, Pa., for plaintiffs; Thomas L. Cantrell, Philadelphia, Pa., of counsel.

Alfred B. Engelberg, Silver Spring, Md., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Donald E. Lane with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on May 5, 1966. Plaintiff has filed no exceptions to the commissioner's findings or opinion and the defendant excepts only to some of the commissioner's findings and conclusions. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, with one slight additional modification, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Therefore it is concluded that claims 3 and 5 of patent 2,580,482 are invalid, that claims 1, 2, 4, 6, 8, 9, 14, 15 and 16 of patent 2,580,482 are valid but have not been infringed by the defendant, that claims 5, 6 and 7 of patent 2,843,408 are valid and have been used by defendant without license from the patent owner, and that plaintiffs are entitled to recover for such use. Judgment is entered to that effect with the amount of recovery to be determined pursuant to Rule 47(c) (2).

OPINION OF COMMISSIONER**

LANE, Commissioner:

This is a patent suit under Title 28 U.S.C. § 1498, in which plaintiffs seek to recover reasonable and entire compensation for the unauthorized use or manufacture by or for the defendant of patented inventions. Plaintiffs alleged infringement of claims 1–6, 8, 9, and 14–16 of U.S. Letters Patent No. 2,580,482 entitled "Turnbuckle Lock" which issued to the plaintiffs Louis C. Stukenborg and Harold V. Utterback January 1, 1952, on an application filed July 12, 1945. Plaintiffs further allege infringement of claims 5, 6, and 7, of U. S. Letters Patent No. 2,843,408 entitled "Lock for Turnbuckle" issued to Stukenborg July 15, 1958, on an application filed June 27, 1956. Plaintiffs Stukenborg and Utterback are the owners of said patents. Plaintiff, Associated Aircraft Industries, Inc., is the exclusive licensee with the right to grant sub-licenses under said patents. The parties have agreed to defer trial of any accounting issues until the issues of patent infringement and patent validity are decided.

■■■ It is found that claims 3 and 5 of the '482 patent are invalid and that claims 1, 2, 4, 6, 8, 9, and 14–16 of the '482 patent are valid but not infringed. It is further found that claims 5, 6, and 7 of the '408 patent are valid and infringed.

Both patents in suit describe and claim improve turnbuckle assemblies. A turn-

---

** The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

**500**

buckle assembly is an adjustable connector generally used to interconnect cables, wires, or rods so that the length and tension of the cables, wires, or rods may be readily adjusted. A turnbuckle assembly of the type involved in this suit is illustrated in the accompanying drawing. A conventional turnbuckle as-

TURNBUCKLE ASSEMBLY

STRAIGHT END

HOOK SHOULDER

END LOOP

HOOK LIP

HOOK LOOP

HOOK END

FIGURE 1

BARREL or SLEEVE

FIGURE 2

TERMINAL RODS

DIRECTION OF PULL FOR INSPECTION

FIGURE 3

FIGURE 4

sembly is comprised of a cylindrical barrel or sleeve having terminal rods threaded in each end. Since World War I, turnbuckle assemblies have been used extensively in aircraft primary and secondary flight control systems for interconnecting and. adjusting the length and tension of control cables. For example, the B–52 airplane has over 100 turnbuckle assemblies mounted therein. One of the principal objections to the use of turnbuckle assemblies in flight control systems has been that the barrel or sleeve portion of the assembly has a natural tendency to unscrew, causing the cables to become loose or disconnected. To prevent the unscrewing of the barrel once the turnbuckle was properly adjusted, the aircraft industry adopted a somewhat elaborate method of wrapping the conventional turnbuckle assembly with locking wire. At least one airplane crash

has been attributed to the breaking of the locking wire and the subsequent unscrewing of the turnbuckle barrel. After a period of use, a control cable becomes stretched and requires periodic retensioning. Many of the turnbuckle assemblies are located in remote locations in an airplane, requiring a skilled mechanic, sometimes using only one hand, to unwrap locking wire on the turnbuckle assembly, adjust the cable tension, and then to rewrap the assembly. The average time required to adjust the tension of a control cable by this method is from 10 to 30 minutes. The aircraft industry has been continuously seeking a turnbuckle assembly that was more reliable and less expensive to maintain. During the 1940's the industry evaluated over 21 proposed devices. None of these was found to be sufficiently better to warrant a change.

In 1944 Stukenborg, while working in a machine shop that made conventional turnbuckle assembly parts, developed several turnbuckle assemblies which eliminated the need to wrap the turnbuckle assemblies with locking wire. In 1945 a patent application was filed by Stukenborg and Utterback that issued in 1952 as the '482 patent here in suit.

Fig. 1 of the '482 patent shows a turnbuckle assembly in which the turnbuckle rods have longitudinal grooves cut therein at a depth greater than the depth of the threads, and the barrel has radial notches formed in its ends. A somewhat U-shaped locking member or clip is positioned with one leg of the member in the rod groove and the base of the locking member engaging the barrel in a radial notch. In this embodiment the base of the locking clip is the primary locking member preventing the barrel from rotating relative to the rods. In Fig. 6A, however, the longitudinal grooves in the rods are grooved to the depth of the threads only, and a longitudinal groove is cut in the threads of the barrel so that when the rod and barrel longitudinal grooves are alined they form a longitudinal aperture in which is positioned one leg of the locking clip. In this embodiment the leg of the locking clip is the primary locking member preventing the rotation of the barrel in relation to the rods. After the patent issued, an exclusive license was granted by the patentees to the plaintiff, Associated Aircraft Industries, Inc. At first personnel of Associated attempted without success to sell turnbuckle assemblies that were similar to the assembly shown in Fig. 1 of the '482 patent. In 1953, Associated had limited success in selling turnbuckle assemblies similar to that shown in Fig. 6A of the '482 patent. Even though many of the engineers in the aircraft industry were enthusiastic about the new turnbuckle assembly, its safety and reliability were questioned because it was thought that the locking clip could possibly vibrate from engagement with the other turnbuckle parts and that the clip could be pulled from the assembly by a pull of less than 15 pounds. Associated contracted with an independent testing laboratory to test the new turnbuckle assembly. At the completion of the favorable tests, the test reports were sent to the aircraft manufacturers. The Glen L. Martin Company conducted an analysis to compare what was by then generally referred to as the "Stukelock" turnbuckle assembly with the conventional assembly. Martin found that it took an average of 15 minutes to adjust the conventional turnbuckle whereas it took less than a minute to adjust the "Stukelock" assembly. Martin estimated that this time saving would transpose into a saving of $1.50 per assembly in the initial installation of the assembly into the airplane and an additional saving of $2.25 every time the assembly was adjusted thereafter. It was also found that the "Stukelock" turnbuckle assembly was more reliable because the locking feature could withstand a substantially greater torsional force. Meanwhile, Stukenborg was attempting to develop a method of securing the clip more firmly to the other turnbuckle parts. In 1956, he filed a patent application on an improvement to the original device, which incorporated a new clip that could be readily secured to the other parts. The patent issued in

1958 as the '408 patent, in which claims 1–4 (not here in issue) are directed toward the improved clip and claims 5–7 are directed to the improved turnbuckle assembly.

In 1956 the aircraft industry approved the use of the "Stukelock" turnbuckle assembly and assigned NAS numbers 645–651 to the component parts and 1074 to the complete turnbuckle assemblies. Soon thereafter the military approved their use. By 1961 it was required that all new aircraft furnished to the Department of Defense make use of the "Stukelock" turnbuckle assemblies (NAS 1074).

As an affirmative defense to the plaintiff's charge of infringement the defendant contends that the patent claims placed in issue by the plaintiffs are invalid on the ground that the inventions recited therein are unpatentable in view of the prior art available at the time the inventions were made.

In support of its contention, the defendant directs the court's attention to four prior art patents set forth in finding 16. Defendant's expert witness placed particular emphasis on the German 747,256 patent as anticipating the '482 patent claims in issue. The German patent discloses a turnbuckle assembly very much like that shown in Fig. 6A of the '482 patent, in which the barrel has a longitudinal groove formed in its threads and the rods have longitudinal grooves cut in their threads. A U-shaped clip has one leg inserted into the longitudinal aperture formed by the alined rod and barrel grooves. It is concluded that claims 3 and 5 of the '482 patent read on the turnbuckle assembly disclosed in the German patent and are thereby invalid. The German patent does not, however, disclose or suggest that the longitudinal groove in the barrel be deleted and the depth of the rod grooves be increased to accommodate the leg of the clip. Nor does the German patent suggest that a radial groove be cut in the ends of the barrel. It is found that the German patent and the other references cited by the defendant neither singly nor collectively anticipate the invention recited in claims 1, 2, 4, 6, 8, 9, 14, 15, and 16 of the '482 patent.

With reference to the '408 patent the defendant contends that it would have been obvious to one skilled in the art in 1956 to form the clip disclosed in the German patent in the same manner as disclosed and claimed in the '408 patent. Defendant cites the U.S. Patent No. 2,-353,795, issued to Tinnerman, to support this contention. The Tinnerman patent discloses a locking fastener for locking one member such as a radio condenser container to a supporting member or panel having apertures therein. The fastener is made from a flat metal strip, one end of which is attached to the container and the other end of which is formed to define a V-shaped holding portion which when inserted through the aperture in the supporting member springs outwardly enabling one leg of the holding member to engage the underneath surface of the supporting panel, thereby fastening the container to the supporting panel. To modify the strip fastener disclosed in the Tinnerman patent to correspond to the clip disclosed and claimed in the '408 patent would require that the fastener be substantially changed in shape and structure and then taken from an unanalogous art and applied in cooperation with the other turnbuckle components in the same manner as disclosed in the '408 patent. Such a modification would not have been obvious to one skilled in the art in 1956 unless the '408 patent was used as a blueprint. Both the German and Tinnerman patents issued in 1944, which is 12 years prior to the time that Stukenborg, after making many modifications, developed the commercially successful invention recited in the '408 patent. It is concluded that claims 5, 6, and 7 of the '408 patent are valid.

Now turning to the issue of infringement, the plaintiffs allege that the defendant, by using some of the NAS 1074 turnbuckle assemblies that the defendant had in its inventory, infringed the patent claims placed in issue. In applying the claims in the same manner as was done in determining their validity,

it is concluded that claims 5, 6, and 7 of the '408 patent read on the NAS 1074 turnbuckle assembly, but that claims 1, 2, 4, 6, 8, 9, and 14–16 of the '482 patent do not.

The plaintiffs allege that the defendant has committed acts of infringement by: (1) using NAS turnbuckle assemblies that were purchased by the airplane manufacturers from unlicensed sources and furnished to the defendant as part of the original airplane equipment; (2) using NAS 1074 turnbuckles that originally came from licensed sources and which have subsequently had parts replaced with parts purchased by the defendant from unlicensed suppliers; and (3) using NAS turnbuckles that have been assembled entirely from turnbuckle components purchased by the defendant in which all the components except the clips (NAS 651) originated from unlicensed suppliers.

The plaintiffs have failed to show that any of the NAS 1074 turnbuckles furnished to the Government as original airplane equipment were purchased by the airplane manufacturers from unlicensed sources.

There is no evidence that the defendant has purchased complete NAS 1074 turnbuckle assemblies from unlicensed sources. The defendant, however, has purchased a varied amount of the component parts. Since 1960 the defendant has purchased 805 clevis rod ends (NAS 645), 260 eye ends (NAS 648), 40,990 wire rope stud terminals (NAS 650), and 2,755 turnbuckle barrels (NAS 649) from unlicensed suppliers. During the same period the defendant purchased 109,675 clips from licensed sources. From these component parts 2,755 NAS 1074 turnbuckle assemblies could be constructed.

It is clear that the defendant purchased the NAS turnbuckle components to (1) assemble the components to make complete NAS 1074 turnbuckle assemblies for replacing the conventional wire-wrapped turnbuckles (AN 10482) and the original NAS 1074 turnbuckles furnished by the airplane manufacturer on an "as required" basis, and (2) replace like parts.

Each time a NAS 1074 turnbuckle is adjusted the clips are removed and discarded and new clips are installed. It is also customary that when a cable becomes frayed or damaged, the terminal (NAS 650) affixed to the cable is disconnected from the turnbuckle barrel, the terminal and cable are discarded, and a new terminal and cable length are installed. It is rare that the turnbuckle barrel by itself needs to be replaced. This is the principal reason the defendant purchased 109,675 clips (NAS 651) and 40,990 terminals (NAS 650) as compared to only 2,755 barrels.

Plaintiffs urge that when one of the components purchased from the unlicensed suppliers is used in a turnbuckle assembly the defendant infringes on the theory that in effect a new turnbuckle assembly has been constructed.

Under the patent law doctrine of repair or reconstruction, if a device is reconstructed it takes on the nature of a new infringing device, whereas, if the device is merely repaired, it does not take on the nature of a new device. See Marconi Wireless Tel. Co. of America v. United States, 99 Ct.Cl. 1 (1942), modified on other grounds, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731.

In the recent Supreme Court case, Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc., 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961), referred to as "Aro I," the court held the replacement of the fabric of an automobile convertible top was a repair of the patented device and not a reconstruction where the patent claims were directed to a combination of three elements, a flexible top fabric, supporting structure, and a mechanism for sealing the fabric against the side of the automobile. The court states at page 345, 81 S.Ct. at page 604 that—

No element, not itself separately patented, that constitutes one of the elements of a combination patent is entitled to patent monopoly, however essential it may be to the patented combination and no matter how costly or difficult replacement may be. * *

and at page 346, 81 S.Ct. at page 604 that—

> The decisions of this Court require the conclusion that reconstruction of a patented entity, comprised of unpatented elements, is limited to such a true reconstruction of the entity as to "in fact make a new article * * *."

In applying these principles to the present case, it is concluded that when a turnbuckle barrel or terminal is replaced, the resulting turnbuckle assembly is not reconstructed within the meaning of patent law. Therefore, it is held that when the unpatented turnbuckle barrels and terminals purchased by the defendant from unlicensed sources are used to replace like parts in turnbuckle assemblies originally purchased from authorized suppliers, the defendant does not infringe the combination claims 5, 6, and 7 of the '408 patent.

With reference to plaintiffs' allegation that defendant has committed acts of infringement by using NAS 1074 turnbuckle assemblies entirely constructed from the component parts purchased by the defendant previously mentioned, the defendant replies that it has an implied license to use the assembled turnbuckles. Defendant reasons that since it purchased the clips from a licensed source and that the only use of the clips is in NAS 1074 turnbuckle assemblies, it received an implied license to use said assemblies, even though the other parts that make up the complete assemblies were purchased from unlicensed sources. The clips cost approximately 4 cents each, and a complete turnbuckle assembly costs between $1.50 and $20.00 depending upon its size.

■■ Each claim of a patent gives to the patentee an exclusive right. The mere fact that a person has an implied license to use a device that is covered by one set of claims does not give the person an implied license to use the device in combination with other devices in which the combination is covered by another set of claims. In the famous "Chicken Plucking Machine" cases, the patent contained claims directed to a new chicken plucking machine and other claims directed to new plucking fingers that were contained in the machine. The infringers purchased the fingers from licensed sources and placed them in a machine purchased from unlicensed sources. The infringers argued that by purchasing the fingers which were covered by one group of claims they also obtained a license under the machine claims. The courts held that the infringers received no such license. The defendant could have used the fingers as replacement parts in machines purchased from licensed sources. Hunt v. Armour & Co., 185 F.2d 722 (7th Cir. 1950); Priebe & Sons Co. v. Hunt, 188 F.2d 880 (8th Cir. 1951), cert. dismissed, 342 U.S. 801, 72 S.Ct. 92, 96 L.Ed. 607. See Radio Corporation of America v. Andrea, 90 F.2d 612 (2d Cir. 1937).

■ It is clear in this case that the defendant intends to use most of the clips that it purchased as replacement clips for the clips that are discarded each time one of the turnbuckle assemblies furnished by the airplane manufacturer is adjusted. It is difficult for the defendant to argue that the only way the clips can be used is in combination with the components purchased from unlicensed sources. Nor is the defendant correct in its belated assertion that claims 1–4 of the '408 patent (the clip claims which are not in suit) involve the same invention as claims 5–7, the combination claims on which plaintiff does sue. It is concluded that the defendant does not have an implied license to use NAS 1074 turnbuckle assemblies constructed entirely from the component parts that the defendant purchased.

Although the plaintiffs have not directly shown that the defendant has constructed any NAS 1074 turnbuckle assemblies entirely from the component parts that it purchased, it is found from the facts that defendant has purchased and used more than one of each part necessary to make a complete assembly and intended to make a complete assembly from the component parts, that there has

been infringement. The extent of this infringement should be determined in further proceedings pursuant to Rule 47(c). The rights of the coplaintiffs may be determined in the accounting.