Louis C. **STUKENBORG**, Harold V. Utterback and Associated Aircraft Industries, a partnership, Plaintiffs,

v.

**TELEDYNE, INC.**, a corporation, Defendant.

Civ. A. No. 67–1294.

United States District Court
Cent. D. California.

Jan. 24, 1969.

Andrew J. Belansky, Christie, Parker & Hale, Pasadena, Cal., Alfred C. Aurich, John J. McAleese, Jr., Synnestvedt & Lechner, Philadelphia, Pa., for plaintiffs.

George F. Smyth, William H. Pavitt, Jr., Smyth, Roston & Pavitt, Los Angeles, Cal., for defendant.

## MEMORANDUM AND ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT

PREGERSON, District Judge.

Defendant, Teledyne, Inc., filed a motion for partial summary judgment on May 22, 1968. Plaintiffs filed their opposition and defendant filed a reply. Oral argument on the motion was held before the Court on October 7, 1968, and the matter was submitted to the Court for its decision. Having considered the pleadings and papers on file and the oral arguments of counsel, the Court now makes the following findings of fact and conclusions of law.

Plaintiffs, Louis C. Stukenborg and Harold V. Utterback are citizens of the United States residing in Memphis, Tennessee. Plaintiff, Associated Aircraft Industries is a partnership of the State of Tennessee, and is composed of Elmer S. Eddins, James D. Nunnally, David A. Nunnally, Alice N. Smith, and Betty G. Nease. Defendant is a Delaware Corporation with its regular and established place of business within this judicial district.

This is an action for contributory patent infringement and inducement of infringement arising under 35 U.S.C. §§ 281 and 283. Jurisdiction is based on 28 U.S.C. § 1338(a).

Plaintiffs Stukenborg and Utterback are, and at all relevant times have been, owners of United States Patent No. 2,-843,408 [hereinafter referred to as the 408 patent], issued on July 15, 1958. Plaintiff Associated Aircraft Industries is the exclusive licensee under the 408 patent with the right to grant sublicenses. Plaintiffs claim that defendant has been contributing to the infringment of the 408 patent by selling components that constitute a material part of the invention, knowing that the components would be used in an infringement of the patent.

The 408 patent labels the invention as "Lock for Turnbuckles." The relevant components of the turnbuckle assembly

described in the patent are the turnbuckle barrel or sleeve, the turnbuckle end pieces, and a wire clip which is used to lock the barrel and the end pieces so that the end pieces cannot rotate in relation to the barrel and to each other.[1] Plaintiffs brought suit against the United States in the Court of Claims on this same patent, on the grounds of infringement, and the Court of Claims upheld the patent as valid. Stukenborg v. United States, 178 Ct.Cl. 738, 372 F.2d 498 (1967). The history of the search for an effective means for locking a turnbuckle assembly and the success of the invention embodied in the 408 patent are described in that opinion,[2] and therefore will not be repeated here.

Defendant sells barrels and end pieces conforming to the barrel and end pieces shown in the diagram included with the 408 patent, Appendix D. Defendant does not make the wire clips shown in the patent diagram, and those clips which defendant has sold that conform to the clips pictured in the patent diagram were purchased by defendant from a sublicensee of plaintiff Associated Aircraft Industries. Defendant claims that the 408 patent is invalid, or, if it is valid, then it gives plaintiffs a patent monopoly only on the wire locking clip and not on the corresponding barrel and end pieces.

There is no dispute that claims 1–4 of the 408 patent are directed to and cover only the wire locking clip, and the validity of claims 1–4 is not an issue in this action. Plaintiffs contend and defendant denies that claims 5–7 of the 408 patent cover the whole turnbuckle assembly as combination claims. Defendant argues that claims 5–7 of the 408 patent describe the barrel and end pieces to give the background or show the environment in which the locking clip is to be used, rather than to claim the combination. All parties agree that the proper construction of claims 5–7 is a question of

law rather than a question of fact.[3]

This Court concludes as a matter of law, that claims 5–7 of the 408 patent relate to the wire locking clip and are not claims for the complete turnbuckle assembly. This Court concludes in the alternative that if claims 5–7 are to be read as claims for the complete turnbuckle assembly, then as a matter of law, based on the uncontradicted facts before the Court, claims 5–7 are invalid.

## CLAIMS 5–7 OF THE 408 PATENT ARE CLAIMS FOR THE WIRE LOCKING CLIP RATHER THAN FOR THE TURNBUCKLE ASSEMBLY

Claims 5–7 of the 408 patent are not clearly drafted and therefore give rise to this dispute over their meaning. The first sixteen lines of each of claims 5–7 are identical and read as follows:

"I claim:

In a turnbuckle assembly which includes a hollow, internally threaded barrel, threaded rod ends threadedly engaged with said barrel, said rod ends being respectively longitudinally grooved and said barrel having complementary grooves registered with said rod end grooves, said barrel being transversely apertured substantially at its longitudinal center, resilient wire-like lock clip means for locking said assembly against relative rotation comprising an elongated locking portion lying in and extending inwardly throughout the majority of the length of complementarily registered barrel and rod end grooves, a stem integrally connected at its outer end with the outer end of said locking portion lying along the exterior of said barrel and biased toward the surface of said barrel by the resiliency of said clip means, an anchor portion connected to the inner end of said stem, * * *

---

1. See Appendix D.

2. 372 F.2d at 500–502.

3. Hearing on Defendant's Motion for Partial Summary Judgment, before Harry Pregerson, Judge, October 7, 1968, R.T. p. 23.

[hereafter the language of each of the claims varies somewhat in the description of the anchor portion and its operation]."

Plaintiffs cite various statements in the file wrapper and in the specifications to show that claims 5–7 were considered as combination claims by the Patent Office and approved as such.[4] Plaintiffs also point out that the difference in form between claims 1–4 and claims 5–7 in itself indicates that claims 5–7 were designed to claim something over and above the wire locking clip, which was adequately covered in claims 1–4.[5] Defendant, on the other hand, cites different statements in the specifications and in the file wrapper of the 408 patent to show that the only invention claimed in the 408 patent was the wire locking clip.[6]

■ It is difficult to determine whether the patent examiner who processed the 408 patent considered claims 5–7 as further claims relating to the wire locking clip alone or as claims for the combination turnbuckle assembly. But the understanding or intention of the patentee or the patent examiner is not determinative here, for patent claims are to be restricted to their actual language.[7]

Examining the form of claims 5–7, one finds that the claims do not begin with a description of the item(s) being claimed. Instead they begin with a preamble describing the environment in which the claimed item(s) operate. The preamble begins with the words "In a turnbuckle assembly which includes * * *." The words of the preamble do not describe what is being claimed. The preamble tells where the claimed item(s) will be used, and therefore limit the claim to the

environment described.[8] Thus, when preceded by the word "In," the words "turnbuckle assembly" indicate that the environment for the claimed item(s) is a turnbuckle assembly and do not indicate that the turnbuckle assembly is itself a claimed item. The words "which includes" begin a subordinate adjective clause that describes or tells what is meant by the words "turnbuckle assembly." Everthing following the words "which includes" that is part of the subordinate clause serves to describe the words "turnbuckle assembly" in greater detail. Like the words "turnbuckle assembly," all words that are used to describe "turnbuckle assembly" in greater detail are also part of the preamble indicating the environment for the claim rather than the item(s) being claimed.

The problem in this case is that of determining the end of the preamble in claims 5–7; and because the preamble contains the subordinate adjective clause beginning with the words "which includes," the problem is that of determining the end of that subordinate adjective clause. If the subordinate adjective clause contains the words describing the barrel and end pieces of the turnbuckle assembly, then the description of the barrel and end pieces is part of the statement of the environment of the claim and is not part of the statement of the item(s) being claimed. This would mean that claims 5–7 do not claim the barrel and end pieces, either alone or in combination with the wire locking clip. On the other hand, if the subordinate adjective clause beginning with the words "which includes" does not contain the description of the barrel and end pieces,

4. Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment, filed July 15, 1968, at pp. 17, 22.

5. *Id.* at pp. 18–22.

6. Memorandum of Points and Authorities in Support of Defendant's Motion for Partial Summary Judgment, filed May 22, 1968, at pp. 4–7; Defendant's Reply to Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's

Motion for Summary Judgment, filed July 22, 1968, at pp. 23–24.

7. Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 339–340, 81 S.Ct. 599, 601, 5 L.Ed.2d 592 (1961).

8. Williams Mfg. Co. v. United Shoe Machinery Corp., 316 U.S. 364, 368–369, 62 S.Ct. 1179, 1182, 86 L.Ed. 1537 (1942); 4 Deller's Walker on Patents § 259 (2d ed. 1965).

then the description of the barrel and end pieces could be considered as part of the statement of the item(s) being claimed, and claims 5–7 might therefore be construed as claims for the barrel, the end pieces, and the wire locking clip as a combination.

Even with a careful reading of each of claims 5–7, it seems as if the subordinate adjective clause beginning with the words "which includes" may continue through the entire claim. Claims 5–7 are therefore not well-drafted, for it is not immediately clear where the introductory preamble ends, and where the description of the item(s) being claimed begins. Defendant asserts that the preamble ends just before the words "resilient wire-like lock clip means." [9] Plaintiffs apparently assert that it ends just before the words "threaded rod ends." [10]

The Court concludes that plaintiffs' contention is untenable from an ordinary reading of claims 5–7. To interpret claims 5–7 it is helpful to note the language used in claims 1–4 of the same 408 patent. Each of claims 1–4 of the 408 patent, which plaintiffs agree are claims for the clip alone, begins with the following words:

"I claim:

A lock clip adapted for use with a turnbuckle assembly *which includes longitudinally grooved rods and a barrel having grooves complementary to the grooves in said rods, said barrel being transversely apertured to form diametrically opposed apertures,*[11] * * *." [emphasis added]

The subordinate adjective clause beginning with the words "which includes" is used in claims 1–4 to describe the words "turnbuckle asembly," as in claims 5–7. Because claims 1–4 are concededly not claims for the barrel and end pieces, it is clear that the barrel and end pieces ("rods") are mentioned in claims 1–4 to describe the words "turnbuckle assembly." This indicates that the subordinate adjective clause beginning with the words "which includes" continues through the italicized words. Therefore it is reasonable to read the corresponding subordinate adjective clause in claims 5–7 also to continue at least through the description of the barrel and end pieces, for in claims 1–4 and in claims 5–7 the subordinate adjective clause is used to describe the same words—"turnbuckle assembly." [12]

9. *Supra,* n. 6.

10. *Supra,* n. 4 at page 20.

11. Each of claims 1–4 reads as follows:
"I claim:
A lock clip adapted for use with a turnbuckle assembly which includes longitudinally grooved rods and a barrel having grooves complementary to the grooves in said rods, said barrel being centrally transversely apertured to form diametrically opposed apertures, said clip comprising an integral resilient wire-like member including a stem having a length to span from one end of said barrel to one of said apertures, an elongated locking portion adapted for insertion in complementarily registered rod and barrel grooves, an arcuate end portion connecting one end of said stem to said locking portion with said locking portion normally resiliently urged into crossing alongside said stem adjacent said end portion and projecting there beyond, said locking portion having a length substantially equal to but slightly less than the length of said stem, an anchor portion connected to the other end of said stem * * *. [hereafter the language of each of the claims varies somewhat in the description of the anchor portion].

12. The Court here does not ignore the general principle that in construing the claims of a patent, each claim is distinct and separate and limitations in one claim cannot be read into other claims. *See* Cameron Iron Works, Inc. v. Stekoll, 242 F.2d 17, 21 (5th Cir. 1957). Here there is a limitation in both claims and the problem is to determine where the words of limitation end and where the words of invention begin, in claims 5–7. Claims 1–4 contain substantially the same words and are referred to merely to understand the sentence structure in claims 5–7.

Plaintiffs argue that the claims of the patent involved in the case of Welsh Co. v. Chernivsky [13] are similar to claims 5–7 here and were interpreted by the court in that case to be combination claims. Plaintiffs fail to notice, however, that the claims in the *Welsh* case did not contain the words "which includes" and the related subordinate adjective clause that is part of the preamble.[14] In order to construe claims 5–7 of the 408 patent as claims similar to those of the *Welsh* case, one would have to ignore or delete the words "which includes," and this would completely change the meaning of the claims:

"I claim:

In a turnbuckle assembly ~~which includes~~ a hollow, internally threaded barrel, threaded rod ends threadedly engaged [15] with said barrel, * *."

▮ This Court concludes, therefore, that claims 5–7 are not written as combination claims, for the language of claims 5–7 describes the barrel and end pieces to modify the words of environment "turnbuckle assembly" rather than to declare that these are elements of a combination being claimed.

## THE DIFFERENCES BETWEEN THE 408 PATENT TURNBUCKLE ASSEMBLY AND THE TURNBUCKLE ASSEMBLIES IN THE PRIOR ART ARE SUCH THAT THE 408 PATENT TURNBUCKLE ASSEMBLY COULD NOT CONSTITUTE A PATENTABLE COMBINATION

In 1944 a German patent was issued for a lock for turnbuckle assemblies, No. 747,256 [hereinafter referred to as the German patent]. The diagram accompanying the patent disclosed a turnbuckle assembly consisting of three elements— a hollow barrel or sleeve, end pieces, and a wire locking clip.[16]

In 1945, plaintiffs Stukenborg and Utterback filed an application in the United States Patent Office for a patent on their invention entitled "Turnbuckle Lock." This patent was granted and issued by the Patent Office on January 1, 1952, as patent No. 2,580,482 [hereinafter referred to as the 482 patent]. The diagram included with the 482 patent, like the diagram of the 408 patent and the German patent, consisted of three components: the hollow barrel or sleeve, the end pieces, and the wire locking clip.[17]

In 1953, plaintiff Stukenborg filed in the United States Patent Office an application for a patent on an invention entitled "Latch for Anti-Rotational Lock Means." Although it had been applied for almost three years before the 408 patent application was filed, this patent was issued by the Patent Office on July 15, 1958, the same day on which the 408 patent was issued, as United States Patent No. 2,843,407 [hereinafter referred to as the 407 patent]. The diagram included with the 407 patent, like the diagram of the 408 patent, consists of three

---

13. 342 F.2d 586 (7th Cir. 1965).

14. The claims, 342 F.2d at 589 n. 2, read as follows: "I claim: In a resilient baby support, a marginal frame, a spring wire base * * *."

15. The attorneys who prosecuted and, presumably, drafted the claims in the 408 patent were probably aware of the difference in meaning when the words "which includes" are used, for in another patent, which they also prosecuted in the Patent Office for Stukenborg, they did not use the words "which includes" and the related subordinate adjective clause, so that the claims in the latter

patent were like the combination claims in the *Welsh* case:
"I claim:
1. In a turnbuckle assembly, an externally threaded, longitudinally grooved member, an internally threaded, longitudinally grooved, hollow, barrel-like member, * * *"
This latter patent was issued to Stukenborg on the same day that the 408 patent was issued to him, as United States Patent No. 2,843,407, and is discussed in greater detail in the text, infra.

16. See Appendix A.

17. See Appendix B.

components: the hollow barrel, the end pieces, and the wire locking clip.[18]

It does not appear from the Patent Office file wrapper of the 407 patent that either Stukenborg or his attorneys ever mentioned to the patent examiner who was processing the 407 patent that there was a co-pending application for what became the 408 patent. Nor, conversely, does it appear from the file wrapper of the 408 patent that either Stukenborg or his attorneys ever mentioned to the patent examiner processing that patent application that there was a co-pending application for what became 407 patent.[19] It might also be noted that neither the 407 patent nor the 408 patent cite the German patent as a reference.[20]

This Court finds that the German patent, the 482 patent, and the 407 patent are prior art to the 408 patent. Plaintiffs agree that the German patent and the 482 patent can be used as prior art to determine the validity of the 408 patent as a combination patent. There is a dispute, however, as to whether the 407 patent can be considered as prior art to test the validity of the 408 patent as a combination patent.

■ Defendant alleges that component parts corresponding to the components of the 407 patent were sold publicly as early as 1953 and 1954, more than one year before the 408 patent application was filed in 1956.[21] This is supported by the admission of James D. Nunnally in his deposition and not controverted by plaintiffs either by allegation or by supporting affidavits.[22] Therefore, pur-

18. See Appendix C.

19. This question thereby remains a mystery in this case. In their Statement of Genuine Issues, filed July 15, 1968, on page 2, plaintiffs state the matter as a question:

"Whether the Examiners in charge of the applications for '407 and '408 otherwise indicated that they were aware of the copendency of the other application; whether they were in fact aware of the copendency of the other application; whether they had any duty to be aware of the pendency of the other application; whether the application for the '408 was in a different division during the entire period it was pending before the United States Patent Office than the application for '407."

But plaintiffs make no allegations as to these questions and neither side has submitted supporting material for any position. Therefore the Court makes no finding on these matters.

20. Plaintiffs argue, supra n. 4, at page 16, that a copy of the German patent was received in the United States Patent Office on June 7, 1946, and that it is reasonable to infer that the patent examiner in charge of the 408 patent considered the German patent. This Court, on the contrary, does not choose to make this inference.

21. Memorandum, supra, n. 6, at p. 10; Reply, supra, n. 6, at pp. 16–18.

22. Copies of defendant's Exhibits CC–1 to CC–12 were filed on May 22, 1968 with

defendant's Memorandum, supra, n. 6. Exhibits CC–1 to CC–4 are drawings of various end pieces used in the turnbuckle assembly of the 407 patent (and the 408 patent). Exhibits CC–5 is a drawing of the barrel used in the turnbuckle assembly of the 407 patent (and the 408 patent). Exhibit CC–5 is a drawing of drawings of various clips.

In the deposition of James D. Nunnally, taken on November 15, 1967, at pages 50–51, the following testimony is recorded:

Q: Were parts such as depicted by Defendant's Exhibit "CC–5" sold in the year 1953?
A: It is entirely possible, and to the best of my recollection, they were.
Q: Were they also sold in the year following, 1954?
A: Yes.
　*　　*　　*　　*　　*
Q: Defendant's Exhibit "CC–4" shows an approval date of 4/15/53. Were parts such as depicted in Defendant's Exhibit "CC–4" sold during the year 1953?
A: Probably.
Q: And those parts were also sold in the year 1954?
A: I believe so.
Q: Now, as to the parts shown in Defendant's Exhibit "CC–3", showing approval date of April 15, 1953, were parts illustrated in this exhibit sold in the year 1953?
A: To the best of my knowledge and belief, they were　*　*　*.
　*　　*　　*　　*　　*

suant to Rule 56(e) of the Federal Rules of Civil Procedure, this Court must assume that Mr. Nunnally's statements are true.[23] This means that the components of the 407 patent were disclosed to the public before the 408 patent was allegedly invented, so that the 407 patent can be considered as prior art.[24]

The next question is whether the 408 patent meets the requirement of 35 U.S.C. § 103. Section 103 provides that a patent may not be obtained if, at the time the invention was made, the differences between the invention and the prior art would have been obvious to a person having ordinary skill in the art. It is proper for this Court to decide this question on a *motion for summary judgment* where its decision rests on facts as to which there is no dispute. Walker v. General Motors Corp., 362 F.2d 56 (9th Cir. 1966).

It is clear from inspection of the file wrapper, the specifications, and the claims of the 407 patent that the components of the turnbuckle assembly described in the 408 patent are essentially the same as the components of the turnbuckle assembly of the 407 patent, except for the wire locking clip.[25] The 408 patent substitutes a different wire locking clip for the wire locking clip used in the

Q: To avoid bothering you from going to your other exhibits of the "CC" series, and to those exhibits that bear an approval date of 1953, do you feel all of those parts shown by those exhibits were sold in the year 1953?

MR. CANTRELL [counsel for plaintiff]: Would you stop and look at the drawings before you answer that question?

(Thereupon, the witness examines the drawings as requested.)

A: With the exception of the clip.

23. Rule 56(e) of the Federal Rules of Civil Procedure states in part:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits, or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

24. Monroe Auto Equipment Co. v. Superior Industries, Inc., 332 F.2d 473 (9th Cir. 1964), cert. denied 379 U.S. 901, 85 S.Ct. 190, 13 L.Ed.2d 175 (1964).

25. For example, comparing the claims of the 407 patent with the claims of the 408 patent:

| 407 Patent-Claim 1 | 408 Patent-Claims 5–7 |
| --- | --- |

[end pieces]

| | |
| --- | --- |
| In a turnbuckle assembly, an externally threaded longitudinally grooved member | In a turnbuckle assembly which includes * * * threaded rod ends * * * said rod ends being respectively longitudinally grooved |

[barrel]

| | |
| --- | --- |
| an internally threaded, longitudinally grooved, hollow, barrel-like member being apertured intermediate the length of said barrel-like member to form at least one transverse aperture communicating from exterior said barrel-like member into the hollow interior thereof | a hollow, internally threaded barrel * * * said barrel having complementary grooves registered with said rod end grooves, said barrel being transversely apertured substantially at its longitudinal center. |

[barrel-end pieces relationship]

| | |
| --- | --- |
| said members being threadedly engaged with their longitudinal grooves in register. | threaded rod ends threadedly engaged with said barrel * * * said barrel having complementary grooves registered with said rod end grooves. |

407 patent. There is no difference between the end pieces used in the 407 patent and those used in the 408 patent.[26] There is no essential difference between the barrels used in the 407 patent and those used in the 408 patent; plaintiffs state that the only difference between the barrels depicted in the 407 patent and those depicted in the 408 patent is the length of the longitudinal grooves.[27] However, the specifications and claims of the 407 patent do not limit the length of the longitudinal barrel grooves as depicted in the 407 patent diagram,[28] and in fact the barrels sold in 1953–1954 appear to have longitudinal grooves extending the full length of the barrel threads, exactly like the 408 patent barrels.[29]

26. This can be seen simply by inspection of the diagrams accompanying each of the patents. *Compare* Fig. 9 of the 407 patent diagram, Appendix C, *with* Fig. 2 of the 408 patent diagram, Appendix D.

27. Plaintiffs' Answers to Defendant's Interrogatories, filed August 23, 1968:
    *Interrogatory No. 103*
    "Please describe in detail and specifically each difference between the barrel of the turnbuckle assembly disclosed in U. S. Patent No. 2,843,408 and the barrel of the turnbuckle assembly disclosed in U. S. Patent No. 2,843,408, as asserted by plaintiffs in Exhibit "C" to Plaintiffs' Answers to Certain Interrogatories Propounded by Defendant, filed herein July 24, 1968."
    *Answer*
    "Plaintiffs assume that defendant intends that one of the patent numbers mentioned in this interrogatory be 2,-843,407, and their answer is based upon such an assumption:
    The longitudinal grooves in the barrel of 2,843,408 are longer than the longitudinal grooves in the barrel of 2,843,-407."

28. *See* the 407 patent claim in n. 25, *supra.*

29. Defendant's Exhibit CC–5, *supra* n. 22, is a diagram of the barrel sold in the United States in 1953. The diagram indicates that the longitudinal grooves run the full length of the barrel. Defendant's Exhibit EE–2 is a diagram of a barrel apparently used in 1953 and the diagram explicitly states: *"Note that slots run entire length of barrel * * *"*

Actually, without any modification at all, one could take a 407 patent clip and use it on a 408 patent barrel and end pieces and one would then have the 407 patent turnbuckle assembly. Conversely, one could take a 408 patent clip and use it with the 407 patent barrel and end pieces (perhaps lengthening the longitudinal groove in the barrel, if necessary, to make it like the barrels sold in 1953–1954) and one would then have the 408 patent turnbuckle assembly.[30] The only difference in the manner in which the elements cooperate among themselves in the 407 patent assembly and in the 408 patent assembly lies in the fact that the 408 patent substitutes a different wire locking clip for the wire locking clip of the 407 patent.[31]

Mr. Nunnally gave the following testimony at his deposition, *supra,* n. 22, at p. 83:
    Q: Are the barrels now manufactured by defendant in this action basically any different from the barrels of the 200 and 300 Series turnbuckles about which you have just testified?
    A: No, sir.
    Q: Insofar as the end parts are concerned, are there any differences?
    A: There are some differences, but they were not pertinent to this lawsuit. They are just engineering differences.
    Q: So, basically, as I understand your testimony, the parts now sold by defendant in this action are basically the same as the parts which you were offering for sale and disclosing to others throughout the year 1953?
    A: Except for the clip.

30. See Defendant's Exhibit CC–10, which is plaintiffs' diagram of the 408 patent clip. The diagram explicitly states: "SNAP ON LOCK WIRE—to be used with STUKE 201 [407 patent, 482 patent]—TURNBUCKLE BARRELS."

31. In Exhibit "C" attached to Plaintiffs' Answers to Certain Interrogatories Propounded by Defendant, filed on July 25, 1968, plaintiffs state:
    "[T]he individual elements of the turnbuckle assembly disclosed in '408 cooperate between and among each other in a different and superior way to the individual elements of the turnbuckle assembly shown in '407, with the '408 turnbuckle assembly producing a far superior result to that produced by '407."

Note 31—Continued

In all statements by plaintiffs, however, it appears that the differences in the operation of the 408 patent turnbuckle assembly over the operation of the 407 patent turnbuckle assembly are the result of nothing more than the differences in the wire locking clip. Examining the file wrappers of the 407 patent and the 408 patent separately, because neither mentions the other, one finds that the file wrapper of the 407 patent indicates that with respect to claims 14–21 (turnbuckle assembly claims) the essential features on which Stukenborg claimed invention were aspects only of the locking clip:

"For two fundamental reasons, the claims now under discussion clearly seem to distinguish from Stukenborg, cited [482 patent]. First, since in Stukenborg, cited, there is no purpose or suggestion of providing the reversely bent arcuate hook member [of the clip] * * *. On the contrary, here, Applicant * * * has provided the resilient hook portion [of the clip] which is capable of introduction into the barrel aperture, and which upon introduction into the interior of the barrel is of a diameter greater than the diameter of the aperture so that the hook member will positively engage the interior of the barrel against the removal of the anchor from the barrel aperture.

In the second place, the claims * * * recite that the anchor [of the clip] inwardly extends away from the stem portion [of the clip], the hook [of the clip] is arcuately bent to project outwardly and lie alongside in spaced relation to the anchor portion, and that the hook has an outwardly facing tip, and further that this outwardly facing tip is in engagement with the interior of the barrel. It is plain that here is structure [clip] which has no counterpart or suggestion in Stukenborg, cited, and which, operating upon a completely new principle of operation, is effective to accomplish the purpose of locking the threaded members against rotation in a manner quite distinctive and different from that of Stukenborg, cited." Letter from Stukenborg to Patent Office, received March 25, 1957, pp. 6–7.

Similarly, an examination of the 408 patent file wrapper reveals that with respect to claims 5–7, Stukenborg relied on the following features for his claims of invention over the prior art, and it appears that all of the features mentioned to distinguish the 408 patent from the 482 patent are solely attributable to the differences in the clip. If both the 407 and 408 patents differ from the 482 patent only because of their different clips, then it would seem that they differ from each other only because of their clips:

"The remaining claims 5–7, inclusive, * * * are particularly characterized by the acute angularity of the intersection of the anchor [of the clip] with the external stem [of the clip] * * *.

It will be seen that the anchor [of the clip] of the present invention goes considerably further than the anchor 33 of Stukenborg, cited [the 482 patent], in effecting the end result * * *

With the present device it is possible, regardless of the size of the turnbuckle assembly to be employed in aircraft, that wire of uniform diameter [for the clip] may be employed. The chance and the opportunity of error in the installation of the locking clips is substantially eliminated. Heretofore a wide variety and category of sizes of lock clips have been necessary. Under the use of the present invention, but two sizes are required to cover the entire range of turnbuckle assemblies which are employed in aircraft. [It would seem that the 407 patent clip would also have this attribute.] The features of the present invention cause the external portions of the lock clip comprising the stem to closely hug the barrel of the turnbuckle, and to thus eliminate protuberances [of the clip] which might interfere with operation, and which might be snagged or otherwise engaged during operation, thus eliminating substantially the possibility of accidental removal of the lock clip. Additionally, the resiliency of the device [clip] and the arrangement of the locking leg [of the clip] relative to the stem [of the clip], including the crossover and extent of the leg to substantially the length of the stem, causes the locking portion [of the clip] to closely hug and snugly fit against the slots or grooves formed in the interior of the assembly, thus enhancing the positioning of the device and the arrangement of same to prevent the relative rotation of the turnbuckle barrel to the terminal rods." Letter from Stukenborg to Patent Office, received September 6, 1957, pp. 8–11.

It is also apparent from the letters and testimony of Mr. Nunnally that the only differences between the operation and relationship of the elements in the 407 patent assembly and in the 408 patent assembly are attributable to the different clips used. In a letter submitted as Defendant's Exhibit MM, Mr. Nunnally wrote to Mr. Burch of the Navy Depart-

The barrel in the German patent assembly utilizes a longitudinal locking groove extending the full length of the threads,[32] like the 408 patent barrel and like the barrels sold in 1953–1954. Again, the barrel and the end pieces are not materially different from those of the 408 patent assembly.[33] Thus, with slight modification one could take the barrel and end pieces from the German patent and use the 408 patent clip and one would then have the 408 patent turnbuckle assembly. Conversely, with slight modification one could take the barrel and end pieces from the 408 patent and use the German patent clip and one would then have the German patent assembly.

This Court also finds that the complete 408 patent turnbuckle assembly is similar to the 482 patent turnbuckle assembly. Again, the principal difference is the substitution of one wire locking clip for another. There are two types of barrels disclosed in the 482 patent. One uses a radial locking groove at the ends of the barrel instead of a longitudinal locking groove along the threads of the barrel. But the other barrel depicted uses a longitudinal groove,[34] so that the assembly described in claims 3, 5, and 6 of the 482 patent [35] is the same as the 408 patent

Note 31—Continued

ment on May 26, 1955, concerning the change in the 408 patent clips:

"The *clips* have now been redesigned to incorporate a *slight change* in their shapes which we consider an enormous improvement, since the new shape has all of the fine characteristics of strength and security of the former clips, plus quite an appreciable saving in time of installation." [emphasis added]

In his deposition, *supra*, n. 22, at pp. 73–74, Mr. Nunnally affirmed his statements in the letter. The foregoing statement of Mr. Nunnally was emphasized by defendant in its *Memorandum, supra*, n. 6, at pp. 27–29, and has not been qualified or contradicted by plaintiffs.

32. *See* Appendix A.

33. Comparing the barrels in the 407 patent (Appendix C) and the 408 patent (Appendix D) with the barrel in the German patent (Appendix A), it appears that the barrel in the German patent does not have a raised central band as in the 407 and 408 patents. But the latter patents do not claim the raised central band on the barrel as an essential feature of the patents, although it appears that the raised central band of the barrel provides tighter and more secure locking of the clip and greater structural strength at the central aperture of the barrel.

34. These two types of grooved barrels are described in the specifications of the 482 patent at Column 3, lines 43–57. A barrel with both types of groove is depicted in defendant's Exhibit EE–2.

35. For example, claim 3 of the 482 patent reads as follows:

"A turnbuckle assembly, including an internally threaded sleeve, rods having threaded end portions joined thereby, and locking members; said rods each having a longitudinal groove in its threaded portion, and said sleeve having a hole at its longitudinal center, and longitudinal grooves in said internal threads, each respectively cooperating with a said rod groove to receive a said locking member, each said locking member comprising a resilient wire having a stem portion, of length to span from said sleeve hole to an end of said sleeve, said stem having one end bent to form an anchor lug for engagement with said sleeve hole and its opposite end portion bent *to embrace an end of said sleeve* and continue reversely in locking engagement in said rod and sleeve grooves."

The italicized portion is the only part of the claim which can't be read onto the 408 patent turnbuckle assembly. The Court of Claims found this claim and claim 5, below, to be invalid over the German patent. 372 F.2d at 502.

Claim 5 of the 482 patent also could be read onto the 408 patent and vice-versa:

"A turnbuckle assembly which includes an internally threaded sleeve and threaded rods engaged respectively with opposite ends of said sleeve, said rods having longitudinal grooves therein and said sleeve having complementary grooves registerable with said rod grooves by relative turning movement of said rods and sleeve, and locking means including locking portions longitudinally engageable with said rod and sleeve grooves to prevent said turning movements, and sleeve engaging portions resisting longitudinal displacement."

assembly except for the differences in the wire locking clips.

Therefore, before the filing of the 408 patent application, there were at least three turnbuckle assemblies in the prior art, all of which used longitudinal grooves in the threads of the barrels and end pieces and a wire locking clip that passed through the longitudinal grooves to lock the assembly and was anchored to the barrel in whole or in part at the central aperture of the barrel. The components of these three turnbuckle assemblies were essentially the same except for the wire locking clips. By using the appropriate wire locking clip one could thereby obtain any one of these three assemblies without significantly changing the barrel or end pieces. The operational utility and the reliability may have been different for each one of these three assemblies, but the source of the difference lay in the wire locking clip.[36] It clearly was obvious to anyone skilled in the art at the time Stukenborg filed the application for the 408 patent that using grooved barrels and end pieces and a wire locking clip was perhaps the best, simple way to make a locking turnbuckle assembly. It was also obvious that the design of the clip would largely determine how well the turnbuckle assembly would operate in any given application.

When Stukenborg allegedly invented what became the 408 patent, he did not take old components and add a new element to cause the old components to achieve a different or unexpected result. He simply improved the wire clip and substituted the improved clip for the older clips, as had been done in the 482 patent and 407 patent over the German patent. Substituting an improved element in an old combination but still using the same basic elements (barrel, end pieces, wire locking clip) as was used in the old combination, without adding another element, to accomplish the same result, does not give plaintiffs a right to claim a patent monopoly on the whole combination.[37] Lincoln Engineering Co.

36. Accordingly, the specifications for the 408 patent state:

> "This invention relates to certain new and useful improvements in means for locking rotatably engaged members, such as turnbuckle barrels and rod ends or terminals joined by such turnbuckles against relative rotation . * * *.
>
> The present invention is particularly characterized by the improvements residing in the lock member or clip * * *.
>
> The principal object of the present invention is to provide a new and novel lock member or clip for use with turnbuckle assemblies."

37. Plaintiffs rely on the opinion in Welsh v. Chernivsky, *supra*, n. 13, wherein the court stated at p. 590:

> "We think the root of the district court's error was in considering Chernivsky's claim 1, upon which his claims 2 and 3 rest, against the prior art piece by piece instead of considering the device totally, without properly applying the well-established principle that a combination of old elements in a manner that is unobvious to one skilled in the trade and which produces a new and useful result may

be patented. [citations omitted]. Since a combination of old elements alone may be enough to constitute a patentable device, the addition of a new element to the combination should not, as the district court seemed to conclude, result in a limitation of the claims to the new element."

The patent in suit, however, does not fit the situation described in the above quotation. Here Stukenborg did not eclectically put together old elements into a combination that was previously unknown in the art, nor did he put together old elements into a new combination and then add one new element, as occurred, apparently, in the *Welsh* case. Instead, Stukenborg took an old combination and merely improved one of the old elements.

This case seems more analogous and more properly described by the preceding pargaraph in the *Welsh* opinion, also on p. 590:

> "In those cases the patented device contained only a single, limited improvement over a preexisting device in the prior art, and a broader construction of the claims than that allowed by the court would have rendered the patent invalid on the prior art. In the case before us, on the other hand,

of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008 (1938); Bassick Manufacturing Co. v. R. M. Hollingshead, 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251 (1936); Evans Products Co. v. Preco Incorporated, 378 F. 2d 191 (9th Cir. 1967); Goodman v. Super Mold Corp. of California, 103 F.2d 474 (9th Cir. 1939). Even if it is assumed that the improved clip claimed in the 408 patent is inventive and patentable over the old clips this still does not give plaintiffs a right to claim a monopoly on the whole combination. In re Tibony, 241 F.2d 953, 44 CCPA 801 (1957).

■ Plaintiffs argue that this Court must give a presumption of validity to the patent duly issued by the Patent Office, in accordance with 35 U.S.C. § 282. It should be first noted that contrary to plaintiffs' contentions, it is not at all clear from the file wrapper of the 408 patent or the specifications or claims of the 408 patent that the patent examiner considered claims 5–7 to be combination claims for the complete turnbuckle assembly. Even more important, this Court finds that when the German patent and especially the 407 patent are considered with the 482 patent as prior art, the turnbuckle assembly of the 408 patent would not be a patentable combination. But the 408 patent does not list the German patent nor the 407 patent as references, and it has not otherwise been shown that they were considered by the patent examiner.[38] Thus any presumption of validity is rebutted.[39]

■ Plaintiffs also assert that the decision of the Court of Claims, *supra*, upholding the 408 patent as a combination patent, should be given great weight here. Although the decision of the Court of Claims is not res judicata as to this defendant, this Court would give that decision considerable weight, in order to avoid inconsistent decisions. But it seems that although the Court of Claims was aware of the 482 patent, it did not indicate that it used the 482 patent as prior art to test the validity of the 408 patent.[40] The Court of Claims did consider the German patent against the 408 patent, but, in ruling on claims 5–7, the Court found only that the 408 patent *clip* would not have been obvious from the German patent *clip*; the Court apparently did not consider that there is an additional question of whether the *combination* was patentable in light of the German patent, which also used a resilient wire clip.[41] Of greater importance, however, is the apparent fact that the Court

---

there was no single device in the prior art which embodied, except for the coupling device, all of the elements of the Chernivsky device."

38. See nn. 19, 20, and the accompanying text, *supra*.

39. Monroe Auto Equipment Co. v. Superior Industries, Inc., *supra*, n. 24.

40. Counsel for plaintiffs, at the hearing on this motion for partial summary judgment, *supra*, n. 3, at R.T. 28, stated:

"As a matter of fact, your Honor, at the final argument in the Court of Claims they had an enlargement of the '482 patent colored and on an easel just exactly as you see the one before you here. That was argued by counsel for the Government before the Court of Claims, and they didn't pay any attention to it."

41. In its holding the Court of Claims stated, 372 F.2d at 502:

"With reference to the '408 patent the defendant contends that it would have been obvious to one skilled in the art in 1956 to form the *clip* disclosed in the German patent in the same manner as disclosed and claimed in the '408 patent. * * *

To modify the strip fastener disclosed in the Tinnerman patent to correspond to the *clip* disclosed and claimed in the '408 patent would require that the fastener be substantially changed in shape and structure and then taken from an unanalogous art and applied in cooperation with the other turnbuckle components in the same manner as disclosed in the '408 patent. Such a modification would not have been obvious to one skilled in the art in 1956 unless the '408 patent was used as a blueprint. Both the German and Tinnerman patents issued in 1944, which is 12 years prior to the time that Stukenborg, after mak-

of Claims was either unaware of the 407 patent *or did not consider it.*[42] For the foregoing reasons and especially because the Court of Claims did not take into account the 407 patent, the most important piece of prior art for testing the validity of the 408 patent, this Court will not consider the Court of Claims decision as binding on the question of whether plaintiffs have a valid patent on the whole turnbuckle assembly.

Plaintiffs assert that affidavits of engineering experts, especially those of Boese and Whelan, support the contention that the 408 patent was not obvious to one skilled in the art at the time of the alleged invention.[43] The Court finds that the affidavits do not merit that conclusion. Assuming the statements in the affidavits to be true, they do not reach the issue of whether the 408 patent turnbuckle assembly was non-obvious from the 482 patent turnbuckle assembly, the 407 patent turnbuckle assembly, and the German patent turnbuckle assembly. The affidavits merely indicate that the "Stukelock" turnbuckle met with great commercial success and was found to be superior to the old wire-lock turnbuckle.[44] But the affiants use the term "Stukelock" without distinguishing between the 482 patent turnbuckle assembly, the 407 patent turnbuckle assembly, and the 408 patent turnbuckle assembly, all of which were known as "Stukelock" turnbuckles. And none of the affidavits indicates that the 408 patent "Stukelock" turnbuckle assembly was not obvious from the 407 patent "Stukelock" turnbuckle assembly and the 482 patent "Stukelock" turnbuckle assembly.[45]

Plaintiff Stukenborg may have made a significant contribution when he redesigned his wire locking clip into the shape shown in the 408 patent. Certainly the success of the turnbuckle assembly using the 408 patent clip is some circumstantial evidence that it was new and useful. But this Court finds that it would have been obvious to anyone skilled in the art that one might change the shape of the wire clip used in the 407 patent or the 482 patent or the German patent and obtain a turnbuckle assembly that would be more easily and securely locked. The manner in which the clip should have been changed might not have been obvious. But the fact that Stukenborg found a way to improve the clip so that it would be easier to install, less likely to fail, and easier to remove should rightfully give him a legal claim to no more than the improved clip; it should not give him a right to claim a monopoly on the old environment in which the improved clip operates. Therefore, if the language of claims 5–7 were to be construed as claiming the 408 turnbuckle assembly as a combination, then claims 5–7 would be invalid on the grounds of overclaiming. *Great Atlantic & Pacific Tea Co. v. Supermarkets Equipment Corp.*, 340 U.S. 147, 150, 71 S.Ct. 127, 129, 95 L.Ed. 162 (1950).

It is ordered that defendant's motion for partial summary judgment is granted.

---

ing many modifications, developed the commercially successful invention recited in the '408 patent. It is concluded that claims 5, 6, and 7 of the '408 patent are valid." [emphasis added].

42. Plaintiffs' counsel seems to admit that the Court of Claims was not aware of the 407 patent for he stated in court, n.

3, *supra,* at R.T. 29:
"Now it is true that the '407 patent was not before the Court of Claims."

43. Plaintiffs' *Memorandum,* n. 4, *supra,* pp. 8–11.

44. A diagram of the wire-lock turnbuckle assembly is presented herein as Appendix E.

45. See Defendant's *Reply, supra,* n. 6 at pp. 6–8.

Zu der Patentschrift 747 256
Kl. 47d  Gr. 14

Abb. 1.

Abb. 2.  |  Abb. 3.

Abb. 4.

Abb. 5.
(Schnitt A-B)

APPENDIX A

Jan. 1, 1952  L. C. STUKENBORG ET AL  2,580,482

TURNBUCKLE LOCK

Filed July 12, 1945

INVENTOR.S
*Louis C. Stukenborg*
*Harold V. Utterback*
by *J.H. Weatherford*
*Atty.*

PATENT DEPARTMENT
RECEIVED

OCT 6 1958

DOUGLAS AIRCRAFT
COMPANY, INC.

APPENDIX B

July 15, 1958      L. C. STUKENBORG      2,843,407

LATCH FOR ANTI-ROTATIONAL LOCK MEANS

Filed Dec. 10, 1953

INVENTOR
LOUIS C. STUKENBORG
BY

APPENDIX C

July 15, 1958     L. C. STUKENBORG     2,843,408

LOCK FOR TURNBUCKLES

Filed June 27, 1956

FIG.1.    FIG.2.    FIG.3.    FIG.4.    FIG.5.

INVENTOR,
LOUIS C. STUKENBORG

BY

Weatherford & Weatherford
attys

APPENDIX D

WRAPPED TURNBUCKLE ASSEMBLY

APPENDIX E